THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES E. DODDS, Defendant-Appellant.

First District (3rd Division)   No. 1—86—3196

Opinion filed November 8, 1989.

Randolph N. Stone, Public Defender, of Chicago (Julia M. Gentile, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund and Sara Dillery Hynes, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE FREEMAN delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, Charles Dodds, was found guilty of murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1) and sentenced to a term of life imprisonment in the Illinois Department of Corrections. On appeal, defendant contends that: (1) the trial court erred in denying his motion to suppress his confession; (2) the exclusion of evidence denied him a fair trial; (3) he was not proved guilty beyond a reasonable doubt; and (4) he was prejudiced by improper closing arguments made by the prosecution. We affirm.

Prior to the trial, defendant filed a motion to suppress his confession. The basis for the motion was that the confession had been made involuntarily. At the suppression hearing, the State presented the testimony of seven police officers. Recitation of each officer's testimony would be cumulative, thus a general summary of their testimony will suffice.

Detective James Gildea testified that on February 5, 1985, he and his partner, Scott Keenan, were assigned to investigate a homicide at 1635 West Morse Avenue in Chicago. Upon arriving at that address, Gildea went to a third-floor apartment in the building, where he saw the bodies of two homicide victims, Shirley Glenn and Thomas O'Connor. At about 8 p.m. that same evening, he arrested defendant, who was in another apartment in the building, and transported him to the police station. Once at the police station, defendant was asked to remove his clothing and was given a paper suit to wear. Defendant's clothing was then sent to the crime lab for analysis.

On the evening of his arrest, defendant was interviewed, once, by Officer Dennis Gray. According to Gray, defendant appeared "natural" at first but, towards the end of the interview, defendant began to nod off to sleep. It appeared to Gray that defendant was under the influence of drugs or alcohol; however, at the time of the interview, Gray was not aware of defendant's earlier alcohol and drug consumption. Defendant was permitted to sleep, in the interview room, until the following morning.

On February 6, defendant was interviewed by detectives about four or five times during the course of the day. Prior to each interview, defendant was advised of and waived his *Miranda* rights. Each of these interviews lasted in duration for 15 to 20 minutes. During each of the interviews, defendant appeared to be alert and was responsive. Defendant was handcuffed to a ring which was attached to a wall in the interview room; however, the handcuffs were removed

during the interviews. During defendant's period of detention he was given food, pop and cigarettes and was permitted the use of the lavatory. The detectives made no threats of physical abuse and no promises of leniency in exchange for his cooperation.

On the morning of the sixth, defendant's mother, Clara Dodds, visited him at the police station. She was permitted to speak with defendant privately. Even though the door to the interview room remained open during her visit, the detectives were not able to overhear their conversation.

Beatrice Hart testified that she had been a police officer for five years and that she and defendant were friends. Hart was also the friend of Glenn, and was the godmother of Tamiko Coleman, Glenn's daughter. On February 5, 1985, Hart was informed by Detective Michael O'Brien that defendant had been arrested in connection with the murders of Glenn and O'Connor and that defendant had requested to see her. On February 6, Hart visited with defendant three times at the police station. Hart stated that the first and third of her visits with defendant were at his request. Hart was not in uniform at the time, and neither she nor defendant spoke of the allegations pending against him. Hart stated that defendant was concerned about Tamiko and inquired about her welfare. Each time Hart spoke with defendant, he was alert and appeared to be fine.

During Hart's third visit with defendant, which occurred at about 10:30 p.m., defendant began to talk about the murders. At trial, Hart testified that defendant told her that she knew what he had gone through with Glenn, and that he couldn't take it anymore. Hart interrupted defendant's statement, and responded that she was there as his friend, not as a police officer. Hart then summoned the detectives into the interview room. Defendant then made an oral statement confessing his involvement in the murders.

Assistant State's Attorney Robert Babbitt stated that on February 7, the investigating officers advised him that defendant was admitting his participation in the homicides. At about 1:55 a.m. that day, after defendant had made a second oral statement, he agreed to make a court-reported statement. Babbitt and Officer Scott Keenan were the only two present with defendant at this time. Prior to making the statement, defendant was advised again of his *Miranda* rights. Defendant's statement was taken, transcribed, and Babbitt then read it to him. Defendant then read the statement, made corrections on it and initialled his corrections. In response to Babbitt's inquiry concerning defendant's treatment by the police, defendant stated that the policemen had treated him "very nice."

At the close of the evidence, the trial judge stated that there was no evidence of any physical brutality or coercion. The court noted that defendant had been permitted to sleep for portions of the period of his detention, he had been permitted use of the lavatory, he had been given food and cigarettes upon his request, and he was permitted to speak privately with his mother. The trial court found that Hart's conversations with defendant were not for investigatory purposes. Finally, the trial judge stated that, with the exception of the first interview, the evidence showed that defendant was alert and responsive and that there was no evidence that he was impaired due to his earlier use of drugs and alcohol. Based on this evidence, the court denied defendant's motion to suppress his confession.

At trial, Carmon Frapolli, manager of the 1635 Morse Avenue apartment building, stated that defendant and Glenn had moved into the apartment building in July 1984 and that they occupied apartment number 303. Defendant moved out of the apartment about three weeks prior to the murders. The move was the result of the last of many breakups between defendant and Glenn, and this time, Glenn had secured a restraining order against him.

After a competency determination, nine-year-old Tamiko Coleman testified that on the morning of the murders, she saw defendant as she was on her way to school. Defendant asked her whether O'Connor and Glenn were in bed together, to which Tamiko replied "Yes." Later that same day, when Tamiko returned home from school, she went to her apartment, knocked on the door, but she received no response. She then went to the second-floor apartment of Nancy Kaminski, where she played for a while, and then went outside. While she was outside, she was again approached by defendant. According to Tamiko, defendant told her that Glenn and O'Connor were not at home and that she should go to her grandmother's house. Tamiko went to Clara Dodds' house, later returned to her apartment, and after again receiving no response there, she returned to the Kaminski apartment.

Beatrice Hart testified concerning her third visit with defendant, during which time he initiated a statement confessing his involvement in the murders. According to Hart, defendant stated that when he saw O'Connor and Glenn together on the morning of February 5, 1985, it made him so angry that he walked up to O'Connor and hit him. Ervin Lewis was with defendant at the time, and it was Lewis who broke up the fight. Defendant then waited at the corner for Tamiko to go to school and when she came by, he asked her if O'Connor and Glenn had slept together. When Tamiko responded in the af-

firmative, defendant could not believe it because he had been good to O'Connor in the past. Defendant wanted to get some of his things from the Glenn apartment, so he and Lewis went there. Once at the apartment, defendant, Lewis, O'Connor and Glenn sat around and drank tequila. As defendant sat there, he looked at O'Connor with Glenn and he became very angry. Defendant then asked for his belongings, and O'Connor told him to get out. Defendant and Lewis left Glenn's, and defendant went to his mother's home. Defendant drank alcohol, took some pills, and the more he thought about O'Connor and Glenn, the angrier he became. Defendant and Lewis returned to Glenn's apartment building, and while Lewis remained downstairs, defendant went upstairs to Glenn's apartment. The door to the apartment was open, and defendant walked inside. Glenn was sitting on the couch in a drunken sleep, and O'Connor was also on the couch. Defendant grabbed a knife from the back of O'Connor's waistband. As O'Connor attempted to get up, defendant hit him with the knife twice, and he staggered back. When O'Connor tried to get up again, defendant hit him with the knife again. Defendant then put a tape in the tape player, walked over to Glenn, awakened her and told her to "look at [her] man now." When Glenn looked, she attempted to scream, and, in an effort to quiet her, defendant cut her throat. He stabbed her repeatedly, telling her that he loved her. Defendant then sat down in a chair next to the couch, threw the knife over in the corner and put on a tape of the song, "The Girl Is Mine." Defendant sat there, talked to Glenn, drank more tequila, then left. As he left the apartment, he locked the door to prevent Tamiko from discovering the bodies. Defendant met Lewis downstairs and told him that he was surprised that there was not much blood. He and Lewis then left the building, and defendant later returned to wait for Tamiko. When Tamiko arrived, defendant sent her to his mother's house, and he went inside the building, to another tenant's apartment, to get high.

Babbitt read defendant's court-reported statement into the record. The statement does not differ significantly from Hart's testimony concerning defendant's oral statement. In the interest of brevity, only those statements which differ from the court-reported statement will be recited here. According to the court-reported statement, defendant was at Glenn's apartment only once on the day of the murders, and Lewis was not mentioned as having visited the apartment with him. Additionally, in the court-reported statement, defendant stated that while he was at the apartment, he, Glenn and O'Connor were using drugs and drinking alcohol. In the oral statement there was no mention of drug use by Glenn and O'Connor. Finally, according to the

court-reported statement, O'Connor got up from the couch, started towards the bathroom and defendant grabbed his (O'Connor's) knife. Defendant then stabbed him in the chest and carried his body back to the couch and placed him next to Glenn. In the oral statement, defendant stated that O'Connor was sitting on the couch when he stabbed him.

Following the denial of defendant's motion for directed verdict, defendant presented his case. Clara Dodds testified that on February 7, 1985, her brother, Ervin Lewis, came to her house. His pockets were bulging with money. Dodds asked him where he had gotten the money, and Lewis replied that he had gotten it from Glenn. According to Dodds, Lewis told her that he had slashed Glenn's throat and that he had also killed O'Connor. Dodds started to scream, Lewis grabbed her around her throat and started choking her. Lewis told Dodds that if she told the police what he had told her that he would kill her. Dodds did not report Lewis' confession and threat to the police for fear that he would carry out his threat.

Defendant testified on his own behalf. He admitted making portions of the court-reported statement voluntarily, but he stated that parts of the statement, particularly those portions concerning the violence, were made at the insistence of the police. Defendant stated that his fight with O'Connor on the morning of the murders was over money. According to defendant, after his street fight with O'Connor, he (defendant) and Lewis went to Glenn's apartment. Defendant and O'Connor talked about money while Glenn and Lewis prepared drinks. Defendant and O'Connor then left the apartment, leaving Lewis there, alone, with Glenn. He stated that that was the last time he saw Glenn and O'Connor. At 2:30 p.m., defendant returned to the apartment building and asked Simon Jankovic, the security guard, for permission to speak with Childress, who was a tenant in the building. Defendant spent some time in the Childress apartment. When he left Childress', he went upstairs to Glenn's apartment, knocked on the door, but received no response. He then left the building, saw Tamiko standing outside, and told her that her mother was not at home. He sent Tamiko to his mother's house, and he then went to purchase drugs. At about 4 p.m., defendant returned to the apartment building. He went to Kaminski's apartment, where his mother was visiting, and told her that they should leave because Glenn would call the police on him if she saw him in the building. However, defendant did not leave the building with his mother. Defendant went back to the Childress apartment to take the drugs. While he was in the bathroom there, the police came, slammed him against the floor and arrested him.

Defendant stated that he tried to explain to the police that Lewis was the last one with the victims. He stated that some of the officers were nice to him, but that he had confessed because he was "all messed up." He testified that Hart kept telling him that he had to help Tamiko and that he didn't want to see anything happen to her. He further stated that Hart showed him pictures of Tamiko and told him to cooperate with the police if he wanted to help Tamiko. Defendant stated that he finally gave in. Defendant denied murdering Glenn and O'Connor.

Defendant's first contention on appeal is that the trial court erred in denying his motion to suppress his confession. Defendant maintains that the confession was involuntarily made, and he urges four reasons in support of his claim. The evidence presented at defendant's suppression hearing and at trial does not support his contention.

■ In determining the voluntariness of a defendant's statement, a reviewing court must examine all of the relevant circumstances surrounding the making of that statement. (*People v. Prude* (1977), 66 Ill. 2d 470, 475, 363 N.E.2d 371, *cert. denied* (1977), 434 U.S. 930, 54 L. Ed. 2d 291, 98 S. Ct. 418.) The applicable test is whether the statement has been made freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he confessed. (*People v. Britz* (1984), 128 Ill. App. 3d 29, 40, 470 N.E.2d 1059, *aff'd* (1986), 112 Ill. 2d 314, 493 N.E.2d 575.) In making this determination, the court will necessarily consider factors, including the duration of a defendant's detention prior to making the statement, a disregard of necessities of life, deprivation of counsel, deception restricting the defendant's constitutional rights, and the defendant's age, education, emotional characteristics and his experience in criminal matters. (*Britz*, 128 Ill. App. 3d at 40.) In considering defendant's contention, this court may examine evidence adduced at trial as well as that at the suppression hearing. *People v. Caballero* (1984), 102 Ill. 2d 23, 36, 464 N.E.2d 223, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 298, 105 S. Ct. 362, *modified* (1989), 126 Ill. 2d 248, 533 N.E.2d 1089; *People v. Bradney* (1988), 170 Ill. App. 3d 839, 525 N.E.2d 112.

■ Defendant first argues that his confession was involuntarily made because he was detained for 30 hours prior to making the statement and that during that time he was denied basic human needs. Delay in presenting a defendant to a judge for a probable cause hearing is but one factor to be considered in determining the voluntariness of a statement obtained during the delay. (*People v. Littleton* (1988), 175 Ill. App. 3d 105, 110, 529 N.E.2d 700.) Our review of other confession

cases has revealed that confessions made after even longer periods of detention than here have been found to have been voluntary where there has been no evidence of a violation of the defendant's rights. See *People v. Nicholls* (1969), 42 Ill. 2d 91, 245 N.E.2d 771, *cert. denied* (1970), 396 U.S. 1016, 24 L. Ed. 2d 507, 90 S. Ct. 578 (delay of 34 hours not sufficient to invalidate confession); *People v. Taylor* (1968), 40 Ill. 2d 569, 241 N.E.2d 409 (50-hour detention did not invalidate defendant's confession).

Defendant cites to *People v. Reed* (1984), 123 Ill. App. 3d 52, 462 N.E.2d 512, and *People v. Hadnot* (1987), 163 Ill. App. 3d 215, 516 N.E.2d 582, to argue that factors, including handcuffing a defendant to a wall for many hours, depriving him of normal sleep and refusing to allow him the opportunity to change clothes or to shower, have been held to be coercive even though defendant's requests for water, coffee or use of the bathroom were honored. *Hadnot* is readily distinguishable from the case at bar. There, among other factors, the trial court found that the defendant had been detained for a period of four days prior to being brought before a magistrate and that the police had not kept their promise to release him if he passed the polygraph test. (163 Ill. App. 3d at 219.) Here, defendant's length of detention was far less than four days, and no promises of release had been made. In *Reed*, in addition to those factors stated by defendant, the trial court considered that the defendant was not permitted to visit with his family and friends as he had requested and that his numerous requests to speak to a lawyer and to cease talking to officers were not honored. (*Reed*, 123 Ill. App. 3d at 56.) Additionally, the defendant in *Reed* testified that he had attempted to sleep by stretching out on three chairs which were in the interview room; however, an officer removed all but one of them. (123 Ill. App. 3d at 56.) Further, in *Reed*, there was some question concerning the adequacy of the *Miranda* warnings prior to the defendant making his first statement. (123 Ill. App. 3d at 60.) The record in the instant case reveals that defendant was seated in a classroom-style chair, with an attached table, and that he was permitted to sleep there, without interruption, from about 11 p.m. on the evening of the 5th until the following morning. Further, we note that on the day following defendant's arrest, he was not subjected to long periods of questioning, but rather, was afforded long breaks in between the brief interview sessions. (*Cf. People v. Hill* (1968), 39 Ill. 2d 125, 233 N.E.2d 367, *cert. denied* (1968), 392 U.S. 936, 20 L. Ed. 2d 1394, 88 S. Ct. 2305.) His requests for food, water, cigarettes and use of the lavatory were honored. The abuses found in *Reed*, concerning the *Miranda* warnings, and the denial of the defend-

ant's requests to visit with family and friends, are not present in this case.

Defendant next argues that the inculpatory statement was made while he was under the influence of alcohol. There is no evidence to support the claim that defendant was impaired by alcohol or drugs at the time he gave his statement. Other than at the time of defendant's arrest, on February 5, nothing in the record supports defendant's claim of impairment. Defendant did not confess until several hours after the arrest. But, even if we were to find that he was under the influence of such a substance at the time when he confessed, that would not automatically render his confession inadmissible. (*People v. Andersen* (1985), 134 Ill. App. 3d 80, 85, 479 N.E.2d 1164, citing *People v. Kincaid* (1981), 87 Ill. 2d 107, 429 N.E.2d 508, *cert. denied* (1982), 455 U.S. 1024, 72 L. Ed. 2d 144, 102 S. Ct. 1726.) Suppression is mandated when the evidence clearly demonstrates that because of his condition the defendant lacked the capacity to waive his rights, but when the proof is less clear, the evidence of a defendant's drugged or intoxicated condition merely goes to the weight to be given to the defendant's confession; it does not serve as a total bar to it. *People v. Andersen*, 134 Ill. App. 3d at 95.

Defendant next argues that he shared a special relationship with Hart, whose participation in the interrogation compelled him to confess. A close relationship between a law enforcement officer and a defendant is a factor to be considered in the totality of the circumstances surrounding a confession, but it does not, *ipso facto*, render a subsequent confession involuntary. (*People v. Wipfler* (1977), 68 Ill. 2d 158, 174, 368 N.E.2d 870; *People v. Andricopulos* (1987), 162 Ill. App. 3d 899, 907, 516 N.E.2d 302.) Defendant cites to *Britz*, *People v. Ruegger* (1975), 32 Ill. App. 3d 765, 336 N.E.2d 50, and *Wipfler* as support for this contention. His reliance is misplaced. In *Britz*, the juvenile offender's confession was found to have been involuntarily given where his youth counselor had participated in a scheme with the police to obtain it. (*Britz*, 128 Ill. App. 3d at 33-34.) There, the counselor consented to have the police eavesdrop in on her telephone conversations with the defendant. (128 Ill. App. 3d at 34.) During the telephone conversations, the counselor told the defendant that she was concerned about him, that he could confide in her, and she told him that she thought he was sexually attractive and that his involvement with the police was exciting. (128 Ill. App. 3d at 34.) The counselor urged the defendant to talk with the police, and she agreed to meet him at the police station. (128 Ill. App. 3d at 34.) Unlike the facts in *Britz*, there is no evidence that Hart participated in a scheme with

the police to obtain defendant's confession. The following factors support this conclusion. Officer Gray testified that he had written a memo in which he suggested that Hart be contacted because she might be helpful in the investigation. There was no testimony that she was contacted to participate in the interrogation of defendant. Hart testified that she was present at the police station because she had been requested to accompany a detective to interview Tamiko. Additionally, there is no evidence that while Hart was at the police station that any of the officers asked her to speak with defendant. In fact, Officer O'Brien testified that Hart had requested permission from him to be allowed to speak with defendant, and Hart testified that on two occasions defendant requested to speak with her. *Ruegger* is likewise of little support to defendant's argument. There, the appellate court upheld the trial court's finding of involuntariness because the defendant had been interrogated by a relative, which the court believed might have added an element of subtle compulsion to confess. (*Ruegger*, 32 Ill. App. 3d at 771.) A close reading of Hart's testimony reveals that after defendant stated to her that she knew what he had been through, she summoned the detectives. Once the detectives and Hart were inside the interview room, defendant, directing his comments to Hart, stated that he wanted to get it off of his chest. Hart then asked defendant what happened. Hart and defendant continued to converse concerning the fact that Glenn had put him out of the apartment. Defendant stated that when she put him out and let O'Connor stay there, he couldn't take it. Hart again asked defendant what happened. We do not believe that Hart's inquiry of defendant as to what happened rose to the level of an interrogation. Defendant had already initiated and was continuing to relate his version of the facts at the time of her inquiry. Moreover, even if we were to decide that Hart's prompting was investigative in nature, we could not conclude that such minimal inquiry is enough to warrant a finding of involuntariness. In *Andricopulos*, the defendant's confession was held to have been voluntarily made where a police officer and trusted person of defendant interrogated the defendant for only 10 minutes of a 30- to 40-minute interrogation session and was not involved in a scheme with the investigating officer in order to soften the defendant. (*Andricopulos*, 162 Ill. App. 3d at 906.) Finally, in *Wipfler*, where the chief of police and friend of the defendant admonished the defendant to tell the truth, but did not participate in the interrogation, the confession was held to have been voluntarily given. (*Wipfler*, 68 Ill. 2d at 173-74.) Here, there is no evidence that defendant had even been admonished by Hart to confess. After careful review of the record as a

whole, we do not conclude that defendant's confession was the result of "subtle compulsion" from Hart.

Finally, defendant argues that the inculpatory statement was involuntary because it was untrustworthy and unreliable. Defendant's argument is without merit. The truthfulness or reliability of a confession is not relevant in determining whether it was voluntarily given. *Kincaid*, 87 Ill. 2d at 117.

As a final consideration of defendant's voluntariness issue, we note that at the time of his arrest, defendant was 31 years of age, and according to information contained in the presentence investigation, he was a high school graduate and had attended six months of college. Additionally, this was not defendant's first encounter with the criminal justice system.

At a hearing on a motion to suppress, it is the function of the trial court to determine the credibility of witnesses and to determine the weight to be given to their testimony. (*People v. Clay* (1984), 124 Ill. App. 3d 140, 148, 463 N.E.2d 929.) The State presented several witnesses at the suppression hearing, and if believed, their testimony was sufficient to support a finding that defendant's confession was voluntarily given. Based on this evidence, we cannot conclude that the trial court's finding was against the manifest weight of the evidence. *People v. Reed* (1984), 123 Ill. App. 3d 52, 59, 462 N.E.2d 512.

Defendant's second contention on appeal is that he was denied a fair trial because he was not permitted to present evidence concerning the murders of Nimrod Cooksbey and Venus Manley. Cooksbey and Manley had been murdered 2½ months after the murders in the instant case, and Ervin Lewis had been convicted for those offenses. Defendant posits that the evidence of those murders was relevant under a theory of *modus operandi* to show that Ervin Lewis had also committed the instant murders. Prior to trial, the State moved *in limine* to bar defendant from introducing evidence of the Cooksbey-Manley murders. The State maintained, and the trial court agreed, that there were not substantial similarities between the Cooksbey-Manley murders and the instant murders to establish a *modus operandi*.

■ Generally, evidence of other crimes is admissible under a *modus operandi* theory to establish knowledge, identity, intent, motive, design or plan. (*People v. Taylor* (1984), 101 Ill. 2d 508, 520, 463 N.E.2d 705, *cert. denied* (1984), 469 U.S. 866, 83 L. Ed. 2d 140, 105 S. Ct. 209; *People v. Alexander* (1982), 93 Ill. 2d 73, 442 N.E.2d 887.) *Modus operandi* refers to crimes that are so nearly identical in method that they are undoubtedly the work of the accused. (*People v.*

*Bryan* (1987), 159 Ill. App. 3d 46, 51, 511 N.E.2d 1289.) Some courts have held that evidence is admissible to show *modus operandi* only if the manner in which the crime has been committed is so distinctive as to amount to a "signature." (*Bryan*, 159 Ill. App. 3d at 51.) However, in Illinois, evidence of other crimes has been found admissible where the other offense is substantially similar and shares common features with the offense charged; the crimes need not be identical. (*Taylor*, 101 Ill. 2d at 521.) Absent an abuse of discretion, a trial court's decision on the issue of the admission of evidence to show *modus operandi* will not be disturbed. *People v. Howard* (1988), 169 Ill. App. 3d 536, 538, 523 N.E.2d 943.

In *People v. Lee* (1986), 151 Ill. App. 3d 510, 524, 502 N.E.2d 399, a substantial similarity was found between two shootings where they both occurred within several blocks and within four hours of each other, both involved a small caliber gun, and both victims were shot in the head despite the fact that they had cooperated with their assailant. Likewise, in *Bryan*, the court found substantial similarities between three robberies where all of them had taken place on the same block, within the same 12-day period, defendant had used the same type of gun, wore the same clothing, gave similar commands, escaped in the same direction and approached women who were initially alone. 159 Ill. App. 3d at 52.

The similarities here are that both sets of murders were committed with a knife. The dissimilarities are that the murders in the instant case were committed at the same time and in the same apartment, whereas the other murders were committed 30 hours apart and in different apartments in the same building; the murder victims in the instant case both had their throats slashed, whereas in the other murders the victims each had multiple puncture wounds and the female victim had a slash on the back of her neck and suffered trauma to her head; in the instant case the murder victims were left on the living room couch and no attempt had been made to hide their bodies or to clean the murder scene, whereas in the other murders the bodies had been covered up and some attempt had been made to clean one of the murder scenes; and in the instant case there was no forced entry, whereas in the other murder case there was forced entry into the apartment of one of the victims. At the hearing on the motion, defendant argued that both offenses involved theft. The State, contrarily, stated that in the other murder there was theft of a pen set and stereo equipment from one of the victims; however, there was no evidence of a robbery in the instant case.

We do not view the facts in the two cases to present any strong

or pervasive similarities. Given the dissimilarities between the two sets of murders, we conclude that there was too little, if any, probative value in showing *modus operandi* to outweigh the prejudicial nature of the evidence sought to be admitted. Thus, we find no abuse of discretion in the trial court's decision to grant the State's motion to exclude this evidence.

Defendant's third contention on appeal is that he was not proved guilty beyond a reasonable doubt because: (1) the State relied on defendant's confession which was not voluntarily made and was at variance with the evidence adduced at trial; (2) the conviction was based solely on opportunity and motive; and (3) the physical evidence did not provide a connection between defendant and the crime. We disagree. Since we have already discussed, at length, the voluntariness of defendant's confession, further discussion is not warranted here. We now address defendant's other reasonable doubt arguments.

■ Generally, an uncorroborated confession is insufficient to support a conviction. (*People v. Miles* (1981), 96 Ill. App. 3d 721, 727, 422 N.E.2d 5; *People v. Fields* (1975), 31 Ill. App. 3d 458, 334 N.E.2d 752.) However, under Illinois law the corroboration necessary to sustain a conviction based on a confession is provided by proof of the *corpus delicti*. (*People v. Willingham* (1982), 89 Ill. 2d 352, 359, 432 N.E.2d 861; *People v. Andersen* (1985), 134 Ill. App. 3d 80, 99, 479 N.E.2d 1164.) In a murder case, the *corpus delicti* consists of the fact of the death and that the death was caused by the criminal agency of another. (*People v. Pena* (1988), 174 Ill. App. 3d 281, 286, 528 N.E.2d 325.) A confession tending to demonstrate that the defendant committed the crime, in addition to proof of *corpus delicti*, is sufficient to justify a conviction. (*People v. Lambert* (1984), 104 Ill. 2d 375, 378-79, 472 N.E.2d 427; *Pena*, 174 Ill. App. 3d at 286.) A conviction may be properly based on a confession where the independent evidence shows that a crime did occur, and whether that evidence corroborates or bolsters the circumstances of the confession. (*People v. Webb* (1987), 153 Ill. App. 3d 1055, 1058, 506 N.E.2d 801.) The independent evidence need not establish the occurrence of the crime beyond a reasonable doubt. (*Webb*, 153 Ill. App. 3d at 1058.) Further, a confession need not be accepted or rejected in all respects, and the credibility of a confession is for the trier of fact; the jury may accept all, part or none of the confession. (*People v. DiGerlando* (1964), 30 Ill. 2d 544, 551, 198 N.E.2d 503; *People v. Carter* (1978), 57 Ill. App. 3d 84, 87, 372 N.E.2d 1093.) Any discrepancy between the defendant's confession and the evidence is for the jury to consider in assessing the degree of credibility to afford the confession. *Carter*, 57 Ill. App. 3d at 87.

■ In the case at bar, the fatal stabbings were clearly caused by the criminal agency of another, and the evidence presented at trial fairly validated the statements in defendant's confession. Specifically, the evidence showed, consistent with defendant's statement, that on the day of the murders he had been at the apartment building and in Glenn's apartment. Further corroboration came from Tamiko Coleman's testimony that defendant had inquired of her whether O'Connor and Glenn were sleeping together. Additionally, there was testimony, while not definitive, which left open the possibility that blood scattered over defendant's clothing was that of the victims. Moreover, defendant's statement that he had stabbed the victims and slashed their throats was consistent with the pathologist's testimony concerning the manner and cause of the victims' deaths.

The circumstances related in the confession and the corroborating evidence were sufficient to prove defendant guilty beyond a reasonable doubt. Here, the jury chose to believe the State's evidence, and we do not find that the corroboration of the confession was so improbable as to raise a reasonable doubt of defendant's guilt. *People v. Smylie* (1982), 103 Ill. App. 3d 679, 690, 431 N.E.2d 1130.

■ Defendant's fourth and final contention on appeal is that he was denied a fair trial because of the State's improper comments during closing argument. The State responds, correctly, that defendant has failed to preserve these errors by properly objecting at trial or by raising them in his post-trial motion. Nonetheless, we will consider the issue. A prosecutor is permitted wide latitude in making a closing argument and has a right to comment on the evidence and draw from it any legitimate inferences irrespective of whether they are unfavorable to the defendant. (*Bryan*, 159 Ill. App. 3d at 53; *People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 322, 379 N.E.2d 847.) The propriety of remarks made during closing argument is a matter left to the sound discretion of the trial court, and absent an abuse of discretion, its decision will not be disturbed on review. (*People v. Colley* (1988), 173 Ill. App. 3d 798, 812, 528 N.E.2d 223.) Even where improper remarks have been made, reversal is not warranted unless they were so prejudicial as to have been a material factor in defendant's conviction. *Colley*, 173 Ill. App. 3d at 812.

■ Defendant first argues that he was prejudiced when the State commented on evidence that had been excluded from trial. Specifically, defendant argues that evidence concerning the Cooksbey-Manley murders had been excluded and that the State, by commenting on Clara Dodds' failure to make a timely report to the police about Lewis' confession and threat, unfairly drew the jury's attention to the

fact that defendant had offered no explanation for the delay. Defendant further argues that, had he been permitted to present evidence of the Cooksbey-Manley murders, then Dodds' delayed report of Lewis' confession and threat would have been adequately explained. The objectionable comments are as follows:

"MR. TRUTENKO [Assistant State's Attorney]: *** [A]ll these confessions that Ervin Lewis is really the killer, and think about that for a minute. Clara Dodds. I don't blame her for what she did. When she came up here on the witness stand. It is a natural thing. She is a mother. It is not an unnatural thing for her to put it on her brother [Ervin Lewis] because her brother is not on trial here.

\* \* \*

But don't you think it's a little strange if Ervin Lewis really confessed that he is the murderer that she [Clara Dodds] lets her son sit on his double murder rap and she does nothing about it and doesn't call the police? That's a little bit odd for a woman who loves her son."

We believe that the prosecution was within its right to comment on Clara Dodds' failure to come forward with information about the confession. Defendant, relying on *People v. Ellison* (1980), 89 Ill. App. 3d 1, 411 N.E.2d 350, correctly argues that to comment on excluded evidence is reversible error. However, in the case at bar, testimony concerning Lewis' confession and threat was not excluded; only evidence of Lewis' subsequent murders. The State made no mention of those murders. Dodds was permitted and did testify that she had not come forward with Lewis' confession earlier because of fear that he would kill her. We see nothing improper in the prosecution raising the inference of unreasonableness in Dodds' decision to delay reporting Lewis' confession. The jury, having heard Dodds' explanation for the delay in reporting Lewis' confession and threat, could decide, even absent the State's comments, the reasonableness of her decision. Moreover, we think that further explanation of her delay was not necessary. There was no benefit for defendant in having the jury hear that Lewis actually committed two murders 2½ months after making this confession and threat. Thus, we do not find that the prosecution's comments were improper.

Defendant next points to the prosecution's statement that defendant had gotten enough blood to be detected by the chemical test and that there was blood all over him. Defendant maintains that these comments were contrary to the evidence and gave the jury a false impression. Defendant's argument is not persuasive. Pamela Fish, a se-

rologist employed by the police department, testified that she had examined defendant's clothing for traces of blood. She found traces of blood scattered over the entirety of defendant's trousers, underpants and brown sweater jacket; however, there was not enough blood on the garments to be able to determine blood type or whether the blood was of human or animal origin. Fish also stated that there was a small visible bloodstain on defendant's gray sweater. While she was able to determine that it was human blood, she could not, because of the small amount, determine the blood type. On cross-examination, Fish stated that if blood were not properly cleaned from a garment it could be detected. She further stated that she could not state that the blood traces on defendant's clothing were not from a prior time and improper cleaning. The State merely commented on this testimony. The fact that Fish made no definitive statement that the blood was that of the victims does not negate the fact that she found blood on defendant's clothing. The jury heard the testimony and could properly decide the inferences to be drawn from the evidence presented and the prosecution's statements.

Finally, defendant argues that the prosecutor vouched for the credibility of Hart. The State responds that the comments were proper comment on the evidence and that they were an invited response to defense counsel's closing remarks. As a general rule, it is improper to vouch for the credibility of a witness. (*People v. Emerson* (1987), 122 Ill. 2d 411, 434, 522 N.E.2d 1109, *cert. denied* (1988), 488 U.S. 900, 102 L. Ed. 2d 235, 109 S. Ct. 246.) However, comments by the prosecutor which might ordinarily be considered prejudicial are proper in rebuttal argument if they are invited replies to comments made by defendant in his closing argument. (*People v. Jackson* (1987), 165 Ill. App. 3d 665, 678, 520 N.E.2d 640.) Defendant takes issue with the following comment in the State's rebuttal argument:

> "MR. TRUTENKO [Assistant State's Attorney]: That lady Bea Hart is one of the most sincere honest people you will ever see in your life. *** Bea Hart has nothing to gain."

The prosecution asserts that these comments were in response to defendant's argument that Hart's statement that she was at the police station to help was not truthful, but that her true purpose was to assist in the investigation of defendant. We believe the State's comments were proper response to the defendant's closing argument. Moreover, even if this comment were improper, we believe that the trial court's instruction to the jury cured any prejudicial effect and reversal would not be required. (*People v. Thomas* (1988), 172 Ill. App. 3d 172, 179, 526 N.E.2d 467.) In its instructions to the jury, the court

admonished the jurors that they were the sole judges of the credibility of the witnesses and that they should consider any prejudice or bias that the witnesses might have and the reasonableness of their testimony.

In light of the overwhelming evidence of defendant's guilt, we do not believe that the jury was misled by any of the State's comments. (*Jackson*, 165 Ill. App. 3d at 679.) Thus, we find no abuse of discretion.

For the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

RIZZI and CERDA, JJ., concur.