Second Division
 December 3, 1996











No. 1-94-4276

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the
 ) Circuit Court of
 Plaintiff-Appellee, ) Cook County.
 )
 v. ) 
 )
RAYMOND JOHNSON, ) Honorable
 ) Fred Suria, Jr.,
 Defendant-Appellant. ) Judge Presiding.

 JUSTICE RAKOWSKI delivered the opinion of the court:
 Following a bench trial, defendant was found guilty of first
degree murder, home invasion, and residential burglary. He was
sentenced to 80 years for murder and concurrent terms of 30 years
and 10 years for home invasion and residential burglary,
respectively. Defendant appeals his convictions and sentences
contending: (1) the trial court erred in denying his motion to
suppress a statement made at the time of his arrest based on a
violation of Miranda; (2) the trial court erred in denying his
motion to suppress a confession based on its involuntariness; (3)
the trial court erred in denying his motion to suppress a
confession based on his inability to knowingly and intelligently
waive his Miranda rights due to his substance abuse; (4) the
trial court erred in admitting the victim's hearsay statement as
an excited utterance; (5) the trial court erred in sentencing
defendant on the home invasion and residential burglary
convictions where these offenses are lessor included offenses of
felony murder; (6) the trial court erred in sentencing defendant
to an extended 80-year sentence; (7) the trial court erred in
considering defendant's substance abuse as an aggravating factor
in sentencing; and (8) the mittimus must be corrected to reflect
the proper sentences imposed. Pursuant to Supreme Court Rule 23
(Official Reports Advance Sheet No. 15 (July 20, 1994), R. 23,
eff. July 1, 1994), issues two and three are the only publishable
issues. We affirm defendant's convictions and sentences.
 FACTS
 Defendant was charged with the murder of Halina Grochowski,
which occurred on September 5, 1992. 
 Defendant's court-reported statement indicated that Halina
was his girlfriend and, until two months prior to her death, they
had lived together. Following their breakup, they continued to
see each other as she was tutoring him for his GED examination.
 At 1 or 2 a.m. on September 5, 1992, defendant called Halina
because he wanted money for drugs. He told her he had something
important to tell her and had money for her. She agreed to meet
in the lobby of her building. Defendant arrived at the building
and the guard, who knew defendant, let him in. Defendant told
the guard he was visiting another friend who lived in the
building. 
 When defendant knocked on Halina's door, she refused to open
it. After reminding defendant he was not allowed there, Halina
told him to back away from the door and she went into the
hallway. Halina attempted to close the door, defendant put his
foot in, and said "Baby, let me in." Halina told defendant they
could go downstairs to the lobby. Defendant responded "Baby, I
don't want nobody to see me up here, to call the police on me,"
so he pushed his way into the apartment. In an effort to
determine whether Halina had any money, defendant asked her for
change for a $50. She told him she did not have change. 
Defendant then asked to use the bathroom. After agreeing, Halina
told defendant to hurry up so they could go downstairs.
 When defendant came out of the bathroom, he said Halina was
getting on him about not touching any of her things. According
to defendant, she was talking loud and saying she did not want
him to steal her belongings. To keep her quiet so the neighbors
would not hear and call the police, defendant put his right hand
over her mouth and his left hand against the back of her head. 
He forced Halina into the bedroom, closed the door so no one
would hear, and sat on top of her on the floor. So Halina could
not scream, defendant attempted to tie a bathrobe belt across her
mouth. Because she was struggling, defendant was unable to do
this. Halina then stated in a loud voice, "You bastard, what are
you doing?" Defendant struck her in the eye with his fist and
continued to hit her at least 15 to 20 times. When Halina ceased
struggling, defendant took a quilt from the bed and wrapped her
in it. He also pulled the phone cord from the wall. Defendant
searched for money in her living room and purse but found none. 
He then wrapped Halina's microwave in a plastic bag and put it in
the living room. He went back to the bedroom and saw blood
coming from Halina's mouth and nose. He then saw she was
attempting to get up so he stomped on her stomach by jumping up
and landing on her with his feet. He took the microwave and left
the apartment.
 When he encountered the security guard in the lobby, he told
the guard Halina had gone off on him, pulled a knife, and he was
taking his belongings. The security guard advised defendant he
could not leave with the package until the guard was sure it was
defendant's. Defendant told the guard his mother was waiting
outside for him. The guard told defendant they would go out and
see. When the guard did not see defendant's mother and asked him
about it, defendant stated she must have left. 
 The guard again insisted they go back inside so he could
ascertain that defendant's package was his. Defendant refused to
go back in. The guard then asked him which apartment he had come
from and defendant replied "501." Defendant said he told the
guard the apartment number because he knew Halina was hurt real
bad. Defendant then fled.
 The security guard from Halina's building, Kevin George,
testified on behalf of the State by way of stipulation. 
According to him, after defendant fled, he called the police. 
When they arrived at approximately 1:50 a.m., Halina would not
let them in because she did not believe they were the police. 
After the police left, Halina called her neighbor, who then
called the security guard. The guard entered Halina's apartment
and called the paramedics. The police were called back to the
apartment around 4 a.m., but when they arrived, they found that
Halina had been taken to the hospital.
 Officers Carol Blakely and Alfred King testified that after
leaving Halina's apartment around 4 a.m., they went to the
hospital and interviewed her in the emergency room. When they
asked her what happened, she told them her boyfriend, defendant,
had beaten her up and taken her microwave. She also told them
where defendant lived.
 The police went to defendant's address and found that
someone with defendant's last name signed the register at 2:10
a.m. They advised the security guard to call if that person came
back downstairs. The police returned to defendant's residence at
approximately 7 a.m. When they entered the lobby, defendant was
at the security station. The police placed defendant under
arrest and read him his Miranda rights, which he stated he
understood. According to the police, defendant stated, "You are
here about Halina. I did it because I needed some drugs." They
asked defendant where the microwave was and he told them. After
recovering it, they took defendant to the police station.
 Detectives Reiter and Spencer interviewed defendant when he
arrived at the station. Detective Reiter testified at the
suppression hearing and at trial. During the first interview, at
approximately 11 a.m., Spencer was present but did not question
defendant. Defendant was given Miranda warnings and he stated he
wanted to talk because he wanted to get things off his chest. He
told the officers he had used cocaine. Defendant then made an
oral statement. He also told the officers he only intended to
steal money to get cocaine and had not really wanted to hurt
Halina. Defendant was interrogated for approximately 40 minutes
and then returned to his cell. When this interview ceased,
Reiter found out Halina had died during surgery.
 Reiter returned to defendant around noon. He found
defendant on his knees praying. Reiter took defendant back to
the interview room and told him Halina died. Defendant became
upset and refused to believe Reiter. Defendant again gave a
statement, similar to the first. A short while later, defendant
and Reiter were joined by Assistant State's Attorney Scott
Anderson. Anderson gave defendant his Miranda warnings, to which
defendant responded he understood. Defendant again gave an oral
statement. Anderson contacted his supervisor, Anita Alvarez, who
came to the station. At approximately 3:30 p.m., defendant gave
a court-reported confession. Defendant was allowed to read the
statement and he made corrections.
 Defendant filed motions to suppress both the statement he
made to the arresting officers and his court-reported confession. 
The trial court denied both motions. 

 Nonpublishable material omitted under Supreme Court Rule 23.

 ANALYSIS
 A. Miranda Warnings
 B. Voluntariness of Confession - Promise of Leniency
 Defendant next contends that his court-reported confession
was involuntary because promises were made to him to induce his
confession. At the end of his confession, the assistant State's
Attorney asked defendant whether anyone had made any promises to
him and he stated, "You said if I do it this way, I will get less
time. I won't get that much time." After the statement was
transcribed, defendant was allowed to make corrections. Upon
reviewing his statement, defendant directed that the above-quoted
statement be changed to read, "You said if I give this statement
and tell the truth the judge will see I cooperated, and he might
take it into consideration." According to defendant, his
confession cannot be voluntary because it was obtained based on a
promise, even though slight. He relies on Malloy v. Hogan, 378
U.S. 1, 12 L. Ed. 2d 653, 84 S. Ct. 1489 (1964). Defendant also
relies on People v. Shaw, 180 Ill. App. 3d 1091 (1989), and
People v. Rhoads, 73 Ill. App. 3d 288 (1979). According to
defendant, although Reiter testified no one made any promises to
defendant during the times he was present, the State failed to
ask the arresting officers whether they made any promises. In
addition, when defendant included this statement in his
confession, Reiter, Anderson, and Alvarez were all present and
none of them denied that such a promise had been made. Defendant
argues that this silence, in a situation where a response was
clearly called for, proves the promise was made. The trial court
found that no promise was made to defendant. 
 " 'It is a fundamental principle of
 criminal procedure that a confession must be
 voluntary; otherwise, it is inadmissible. 
 [Citations.] "The test of voluntariness is
 whether the statement was made freely,
 voluntarily and without compulsion or
 inducement of any sort, or whether the
 defendant's will was overcome at the time he
 confessed." [Citations.] A determination of
 voluntariness requires consideration of the
 totality of the circumstances. [Citations.] 
 Factors to be considered in making the
 determination include the age, education and
 intelligence of the accused, the duration of
 the questioning, and whether he received his
 constitutional rights or was subjected to any
 physical punishment. [Citations.] No single
 fact is dispositive; the question must be
 answered on the facts of each case. 
 [Citations.]' " People v. Oaks, 169 Ill. 2d
 409, 446-47 (1996), quoting People v. Melock,
 149 Ill. 2d 423, 447-48 (1992).
Because a "voluntariness determination involves resolving
conflicts in the facts and questions as to the credibility of
witnesses which is best done by the trial court" (Oaks, 169 Ill.
2d at 447), the standard on review is whether the trial court's
determination as to voluntariness is contrary to the manifest
weight of the evidence. Oaks, 169 Ill. 2d at 447.
 Although the original statement could be problematic, we
conclude that the handwritten version is the version to be
analyzed. First, Reiter testified defendant was allowed to make
changes and testified how those changes were made. Reiter stated
that all information to be changed was stricken by Anderson. 
With regard to the changes requested by defendant, Anderson wrote
in the words defendant desired. The changes were written
verbatim. Each change was initialled by defendant, Alvarez,
Anderson, and Reiter. We also note defendant does not contest
that five other substantive changes were made in the same
fashion. Thus, the question is whether defendant's handwritten
statement, "You said if I give this statement and tell the truth
the judge will see I cooperated, and he might take it into
consideration," constitutes a promise of leniency that renders
defendant's confession involuntary.
 "[W]here promises or suggestions of leniency have been made,
the confession is not necessarily inadmissible." People v. Veal,
149 Ill. App. 3d 619, 623 (1986). Likewise, "mere exhortations
to tell the truth or to make a statement do not, without more,
render a subsequent confession inadmissible." Veal, 149 Ill.
App. 3d at 623. See also People v. Wipfler, 68 Ill. 2d 158, 173
(1977); People v. Taylor, 58 Ill. 2d 69, 77 (1974). To
constitute a promise of leniency, the statement must be coupled
with a suggestion of a specific benefit that will follow if
defendant confesses. People v. Eckles, 128 Ill. App. 3d 276, 278
(1984). See also People v. Dozier, 67 Ill. App. 3d 611, 615
(1979) (merely encouraging defendant to tell the truth without
informing him of a specific benefit did not render confession
involuntary).
 Although we have found no authority containing the same
language used here, several cases contain language that can be
compared. In Oaks, the officer told defendant:
 "And I'll tell you what. If we go up
 there and Tonya's telling something
 different, you're going to end up in front of
 a judge *** with us saying that you were ***
 uncooperative and you lied from the
 beginning. And I don't think you want that.
 I really don't think you want that. I
 mean people make mistakes all the time, but
 you have to have some remorse and say that
 there was a mistake and be honest and tell
 what's going on. And if you don't, a judge
 is going to see you just as a hard case." 
 Oaks, 169 Ill. 2d at 448.
The court found that this statement was not a promise but instead
conveyed to defendant that he should tell the truth and if he did
not, the trial judge would look unfavorably upon him. See also
People v. Hartgraves, 31 Ill. 2d 375, 381 (1964) (telling
defendant "It would go easier for him in court if he made a
statement" was a "mere suggestion of the advisability of making a
statement" and did not render defendant's confession
involuntary); People v. Howard, 139 Ill. App. 3d 755, 758 (1985)
(police promise that "if [he] told the truth that everything
would go right on [him] and stuff like that" was a statement for
defendant to tell the truth that did not render his confession
involuntary); Eckles, 128 Ill. App. 3d at 277-78 (police
statement to defendant that it would be in his best interest to
get the truth out as fast as possible and that if defendant told
the truth and cooperated, the police would inform the State's
Attorney and testify in court as to defendant's cooperation was
not promise of leniency because it was open-ended with no promise
of a specific result). But see People v. Ruegger, 32 Ill. App.
3d 765, 771 (1975) (statement involuntary where police told
defendant he would "go to bat" for him on such matters as
recognizance bond and probation if he confessed).
 The cases relied on by defendant are distinguishable. In
Shaw, the trial court found defendant's confession involuntary. 
The appellate court affirmed. Although the officer testified he
made no promises to defendant concerning counseling and
sentencing alternatives, the report he filled out stated, "When
told that he [defendant] could get -- probably get help through
the courts, he related the following ***." Shaw, 180 Ill. App.
3d at 1093. In addition, before defendant signed his statement
he added the following sentence, "Jerry Shaw stated he is sorry
this happened and that he wants help for himself and the police
told him he can get help." Shaw, 180 Ill. App. 3d at 1093. Even
though the officer told defendant numerous times sentencing was
ultimately the trial judge's decision, the court found this
statement to be overcome by the officer's other statements
concerning alternatives. It found that defendant expressly
relied on the officer's promise in making his confession and
thus, his will was overborne. The court distinguished cases in
which a promise was made to defendant but where that promise did
not have an influence on defendant's decision to confess. In
Shaw, defendant did not confess until the officer discussed and
answered defendant's questions concerning counseling. Therefore,
the appellate court found the trial court's decision that
defendant's confession was involuntary was not against the
manifest weight of the evidence. 
 In Rhoads, the trial court found defendant's statement
voluntary even though the officer made a promise that if
defendant talked he would try to get him some help. The
appellate court reversed. The evidence demonstrated that
defendant did not make any statements until the promises were
made to him. In addition, defendant's testimony as to the
promise was uncontroverted. The court placed great emphasis upon
the fact that the police officer who allegedly made the promise
did not contest making it. The court found it was improper for
the trial court to disregard defendant's uncontroverted
testimony. 
 The first part of defendant's statement, "You said if I give
this statement," is like Hartgraves. This was a mere suggestion
to give a statement and cooperate. The second part of
defendant's statement, "tell the truth," is clearly an
exhortation on the part of the officers that it would be better
for defendant to tell the truth and not to lie. Finally, the
last part of the statement, "the judge will see I cooperated, and
he might take it into consideration," is not a promise by the
police that they would do anything on defendant's behalf. There
is no evidence, and defendant does not contend, that the police
told him that if he talked and confessed, he would receive less
time. This portion of the statement is clearly not a promise of
a specific benefit that would follow if defendant confessed. It
is open-ended, as in Eckles.
 Based on the above, the trial court's decision finding
defendant's confession voluntary was not against the manifest
weight of the evidence.
 C. Knowing and Intelligent Waiver of Miranda - Substance Abuse
 Defendant's third contention is that he was unable to
knowingly and intelligently waive his Miranda rights due to his
substance abuse. Defendant contends that his expert's opinion
that defendant was unable to understand and unable to waive his
Miranda rights was carefully considered and reasoned as opposed
to the State's expert's opinion, which was without basis.
 Extensive evidence was presented concerning defendant's
mental state. Officer Blakely testified that when she spoke to
defendant, he was responsive to questions, spoke in complete
sentences, did not slur his speech, and did not appear to be
under the influence.
 Officer King filled out the arrest report in which he wrote
that defendant was intoxicated at the time of arrest. Defendant
had told King he had been drinking and taking cocaine. King
noticed that defendant's eyes were red, his clothes ruffled, and
he looked unkempt.
 Detective Reiter testified that when he spoke to defendant,
defendant spoke in complete sentences and his answers were
responsive. Defendant was calm and did not slur his speech. He
did not exhibit any involuntary shakes and his eyes were not
bloodshot.
 At the end of his confession, defendant stated, "I was under
the influence of drugs during this whole ordeal"; "I was high,"
and "When you use drugs you don't forget what you do", [but] you
have no control over what you do."
 The defense presented Dr. Jeffery Teich, a physiatrist and
specialist in alcohol and drug abuse, to state whether defendant
was capable of knowingly and voluntarily waiving his rights. Dr.
Teich examined defendant on July 8, 1993. Dr. Teich opined that
defendant was not capable of understanding the meaning of the
Miranda warnings based on his 20-year history of drug and alcohol
abuse, treatment for same, seizures, depressive disorder, and low
mental capacity, which was borderline mentally retarded. 
According to him, defendant ingested $300 to 400 worth of cocaine
and two pints of Wild Irish Rose that night.
 Dr. Teich also opined that defendant was intoxicated at the
time of his arrest. According to Dr. Teich, defendant's
intoxication was so extreme he would suffer from hallucinations
that could last days. Defendant also suffered from paranoia and
agitation due to his condition, which would lead such an
individual to become "extremely impulsive," "highly prone to
violent acts," and "unable to consider the consequences of his
behavior." 
 According to Dr. Teich, at the time of defendant's arrest,
he had ingested a large quantity of cocaine, consumed alcohol,
and was taking desipramine (an anti-depressant), all which
combined to render defendant incompetent. The cocaine would
impair defendant's ability to exercise judgment and he would not
be able to comprehend what he was being told. The desipramine
would enhance the cocaine intoxication. The combination of
cocaine and alcohol would leave defendant with no ability to
reason. Dr. Teich opined that, given the condition defendant was
in, it was "essentially impossible for him to properly understand
[the Miranda] rights." 
 Dr. Teich further testified that some of the statements in
defendant's confession could not have been made by him because he
did not speak English that well. He further indicated that many
of defendant's responses were only minimally responsive.
 Finally, Dr. Teich stated that the State's expert did not
have a sufficient basis or information to render an opinion as to
whether defendant was intoxicated at the time of his confession
or whether he was able to voluntarily and knowingly waive his
Miranda rights.
 In rebuttal, the State called Dr. Stafford Henry, a
psychiatrist, ordered by the court to evaluate defendant. Dr.
Henry evaluated defendant on June 8, 1994. Dr. Henry opined that
defendant was able to knowingly and voluntarily waive his rights. 
He based his opinion on the fact defendant was extremely
belligerent and uncooperative during his interview which he found
to be intentional and not caused by mental illness. Dr. Henry
also stated that an individual with defendant's IQ, 75, would
have the intellectual capacity to understand Miranda warnings. 
Finally, when Dr. Henry evaluated defendant, defendant recounted
the offense, was deceptive and manipulative, and would do
whatever he needed in order to get what he wanted.
 The evidence also showed that twice in the police reports
defendant indicated he understood the Miranda warnings. 
Defendant had experience with the criminal justice system and had
previously appeared before the court, had his rights explained to
him, and waived them. 
 The trial court denied defendant's motion finding that
although he used alcohol and drugs on the night of the murder,
his answers to questions were responsive and contained a detailed
description of the evening's events. It concluded that
defendant's substance abuse did not so impair him as to prevent
him from being able to understand and waive his Miranda rights.
 The fact a defendant is under the influence of alcohol or
drugs at the time of a confession does not automatically render
his or her confession inadmissible. People v. Foster, 168 Ill.
2d 465, 476 (1995). Defendant's statement will be suppressed on
the grounds of intoxication or drug use only if, when the
statement was made, defendant was so grossly intoxicated as to be
incapacitated. People v. Matthews, 205 Ill. App. 3d 371, 409
(199). The evidence must clearly demonstrate that, because of
his condition, defendant lacked capacity to waive his rights. 
When proof is less, this goes to the weight of the confession,
not its admissibility. People v. Dodds, 190 Ill. App. 3d 1083,
1092 (1989). 
 In People v. Moore, 208 Ill. App. 3d 515 (1990), defendant
challenged the validity of his confession based on his drug-
intoxicated condition and psychotic behavior. He presented the
opinions of two psychiatrists who stated that defendant committed
the crime as a result of his drug ingestion. The court rejected
defendant's claim that he was so mentally impaired at the time of
his confession that he could not understand his rights as they
were given to him. Several witnesses observed defendant and his
demeanor was calm. Defendant was lucid before, during, and after
commission of the offense. He provided the police and assistant
State's Attorney with detailed information as to what occurred. 
After being given his rights, he stated he understood them and
explained what events occurred. Defendant was calm and
cooperative during the interrogation. Finally, when confronted
with the fact he was telling the police a lie, he quickly changed
his story to conform to the evidence the police suggested they
had. The court found that the above acts were not the acts of an
individual whose will was overborne and that they did not support
a finding that defendant was so mentally impaired.
 In the case before us, there is sufficient evidence to
support the trial court's determination that defendant was
capable of understanding and waiving his Miranda rights. 
Defendant's contention that the trial court improperly placed
greater emphasis on the State's expert's testimony is without
merit. The credibility and weight to be given psychiatric
testimony are for the trier of fact to determine. The ultimate
issue is for the trial court and not for the experts. People v.
Haynes, No. 77569, slip op. at 18 (October 24, 1996), citing
People v. Mahaffey, 166 Ill. 2d 1, 18 (1995), and People v.
Bilyew, 73 Ill. 2d 294, 302 (1978). 
 Moreover, the trial court did not base its decision entirely
on the expert testimony. The court's decision also relied on
defendant's responsiveness during questioning, his detailed
description of events, his vivid recollection of conversations,
and the fact he was lucid and alert. There is ample evidence in
the statement to demonstrate defendant did not clearly lack
capacity to understand and waive his rights. The statement
includes numerous manipulative and clever acts by defendant. 
First, it shows defendant deceived the guard, George, in
obtaining entry to Halina's apartment. The statement also
details several manipulative acts involving Halina: getting into
the apartment; attempting to ascertain whether she had any money;
and stalling to find something to sell. Defendant also told
McDonald, the security guard at his building, he had not done it,
his twin brother had. Finally, defendant told George, the guard
at Halina's building, he had come from 501 because he knew Halina
was hurt "real bad." Defendant's own statement and the words he
used are the best evidence of his capabilities. The statement
was taken verbatim and defendant included direct quotations from
many conversations. He included extensive detail as to his
activities and actions. These actions demonstrate defendant was
not so under the influence of alcohol and cocaine that he was
incapable of understanding. Clearly there is enough information
in the statement for the trial court to draw the inference that
defendant was not so impaired that he was unable to understand
his rights. 
 Finally, the totality of the circumstances supports the
trial court's finding. Defendant was 33 years old. Although
defendant ingested alcohol and cocaine before his arrest, his
first interview by the police was not until four hours later and
his court-reported statement was not until 8« hours after his
arrest. There were no allegations of physical abuse against
defendant by the police. And, although Officer King's report
indicated defendant was intoxicated at the time of his arrest,
none of the individuals who interviewed defendant testified they
observed problems or that he was under the influence of anything.
 For the foregoing reasons, the trial court's decision is not
against the manifest weight of the evidence.
 D. Excited Utterance
 Nonpublishable material omitted under Supreme Court Rule 23.


 E. Lessor Included Offenses
 Nonpublishable material omitted under Supreme Court Rule 23.


 F. Excessiveness of Extended Sentence
 Nonpublishable material omitted under Supreme Court Rule 23.

 G. Aggravating Factors - Substance Abuse
 
Nonpublishable material omitted under Supreme Court Rule 23.

 H. Correction of Mittimus
 Nonpublishable material omitted under Supreme Court Rule 23.

 I. Harmless Error
 Nonpublishable material omitted under Supreme Court Rule 23.

 CONCLUSION
 For the foregoing reasons, defendant's convictions and
sentences are affirmed and the common law record is corrected to
reflect defendant was sentenced to 10 years for residential
burglary.
 Affirmed.
 ZWICK, P.J., and LEAVITT, J., concur.