THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
RICARDO CUADROS MENDOZA, Defendant-Appellant.

Second District No. 2—89—1095

Opinion filed February 5, 1991.

Gary W. Adair & Associates, and Mary Ellen Dienes, both of Chicago (Gary W. Adair, of counsel), for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers and Mary Beth Burns, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BOWMAN delivered the opinion of the court:

Defendant, Ricardo Cuadros Mendoza, was charged by indictment with two counts of murder (Ill. Rev. Stat. 1989, ch. 38, pars. 9–1(a)(1), (a)(2)), in connection with the killing of Tranquilino Salinas.

Prior to trial the defendant moved to quash his arrest and suppress his inculpatory statements to police. Following a hearing, the defendant's motion was denied, and the case proceeded to trial. A jury found the defendant guilty of murder, and the court sentenced the defendant to a term of 34 years in the State penitentiary, with credit for time served in the Lake County jail. The court then denied defendant's motion for a new trial, and defendant filed a timely notice of appeal. We affirm.

On appeal, defendant contends that his conviction of murder should be reversed for the following reasons: (1) the trial court erred in denying the motion to suppress the confession because (a) the defendant was arrested on the pretext of a Federal immigration law violation, and (b) the defendant's subsequent statements were involuntary; and (2) the State failed to prove the defendant guilty of murder beyond a reasonable doubt.

The evidence adduced at the suppression hearing regarding the events surrounding defendant's arrest and interrogation was conflicting and is set out below. The State presented the testimony of seven law enforcement officers, which can be summarized as follows.

Valentin Andrade is a special agent for the Immigration and Naturalization Service (INS). In 1986, he was assigned to the Chicago district of the INS. During that year, he spoke to Detective Gil Farrow of the Lake County sheriff's office about the defendant concerning the death of Tranquilino Salinas. Farrow told Andrade that the defendant had admitted being in this country illegally, and Farrow wanted Andrade to verify the defendant's illegal status. Andrade then applied for an administrative warrant for the arrest of the defendant. However, the defendant left the country before the warrant could be served.

Andrade was transferred to the INS San Antonio office in August 1988. On February 16, 1989, Andrade came to Chicago to work on a case. Upon his arrival in Chicago, Andrade contacted Ms. Alta Gracia Salinas Reyes, the sister of the deceased, Tranquilino Salinas. Ms. Reyes advised Agent Andrade that the defendant had returned to the United States illegally and was then living on South Troy Street in Chicago. Andrade then reviewed the defendant's previous INS file. He also had an INS clerk run a computer check on the defendant's file, and nothing in the INS computer indicated that the defendant was in this country legally. Andrade then applied for and received an administrative warrant for the defendant's arrest based on the information supplied by Ms. Reyes and the information, or lack thereof, from the INS computer.

On Friday, February 17, 1989, at approximately 8 p.m., Andrade went to 5933 South Troy Street in Chicago. He was accompanied by fellow INS Agents Earl Turner, Gustavo Meza and Vincente Munoz. When it was discovered that no one was home at that time, the agents left. Agents Andrade, Turner, Meza and Munoz returned to the home at 5933 South Troy at 1 a.m. on February 18, 1989, and arrested the defendant. At the time of the arrest, Andrade asked the defendant whether he had any immigration documents. The defendant stated that he did not. Andrade asked the defendant whether he had received any documents from the immigration service to allow him to stay in the United States legally. The defendant stated that he had not. Andrade then placed the defendant under arrest on the immigration charge and read to him his rights pursuant to *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.

The agents then took the defendant to the Schaumburg, Illinois, police station. Agent Andrade explained that he had made arrangements to take the defendant to the Schaumburg police station because the Metropolitan Correctional Institution would not take any prisoners from INS agents after business hours on an administrative warrant and that Schaumburg was the closest approved facility for housing an INS prisoner. The defendant was driven to Schaumburg in a car with Agents Andrade and Turner. According to the agents, Turner drove the car; Andrade sat next to Turner in the front seat; and the defendant sat alone in the rear seat. Agents Meza and Munoz traveled in a separate car. During the hour-long trip to Schaumburg, the agents conducted and taped a conversation with the defendant. Agents Andrade and Turner testified that at no time during the drive to Schaumburg did the defendant ask for an attorney. The agents also testified that no promises were made to the defendant, nor were any threats made to or concerning the defendant or his wife.

When the immigration agents and the defendant arrived at the Schaumburg police department, they were told that that facility was not accepting any prisoners. They then drove to the Des Plaines police department, but that agency also refused to accept the defendant. The defendant was subsequently brought to the Franklin Park police department and was placed in the lockup at 4:01 a.m. on February 18, 1989. At or about that time, Agent Andrade made a call to the assistant district director for investigations for the Chicago district of the INS. Andrade informed the assistant district director that the defendant had chosen to proceed with the deportation hearing, whereupon the assistant district director set bond at $10,000. At approximately 4:30 a.m. on February 18, 1989, Agent Andrade informed Lake

County sheriff's department Detective Gilbert Farrow that he had placed the defendant under arrest on a Federal warrant as an illegal alien and that the defendant was being detained in Franklin Park. Andrade and the other agents thereafter left the Franklin Park police department to go to O'Hare International Airport to investigate an unrelated drug smuggling case on which they had been working. Andrade returned to the the Franklin Park police station later that afternoon to serve the defendant with an INS order to show cause.

At 8 a.m. on Monday, February 20, 1989, Sergeant Charles Fagan of the Lake County sheriff's department sent sheriff's deputies Robert Randall and Gilbert Farrow to the Franklin Park police station to interview the defendant. Detectives Farrow and Randall arrived at the Franklin Park police department at approximately 10 a.m. where they met Agent Andrade. According to Detective Randall, they did not discuss the murder case with Andrade. The defendant was then brought into an interview room. At that time, Farrow gave Andrade a preprinted form containing the *Miranda* warnings. Andrade then advised the defendant of his rights in English and in Spanish. The defendant acknowledged receiving the rights but did not sign the waiver form.

Over the next 1½ to 2 hours, Detectives Farrow and Randall interrogated the defendant concerning the killing of Salinas. Although the defendant initially denied any involvement in Salinas' death, he ultimately confessed to the murder. Detectives Farrow and Randall notified Sergeant Fagan that the defendant had made a confession in regards to the Salinas homicide. The defendant was then transported to the Lake County sheriff's department, arriving there at approximately 2 p.m. or 2:30 p.m.

Shortly thereafter, at the direction of Sergeant Fagan, Detectives Farrow and Randall took the defendant in a car to the area of Route 22 and Old McHenry Road in Long Grove. Detective Randall asked the defendant to direct him to where the defendant had murdered Salinas and to where he had left the body. The defendant did so. The detectives and the defendant then returned to the sheriff's office, arriving at about 4 p.m. Detective Fagan asked the defendant if he would agree to a taped interview, and the defendant consented. Detective Farrow contacted Agent Andrade by telephone to request him to act as an interpreter for the taping of the interview. At approximately 7 p.m. on February 20, 1989, Detectives Fagan, Farrow and Randall, and Agent Andrade taped an interview with the defendant. Randall and Andrade again advised the defendant of his *Miranda* rights in English and in Spanish. The interview lasted approximately

one hour. The tape was introduced and played in court during the hearing on the motion to suppress. Detectives Fagan, Farrow and Randall all testified that, during the interrogations by the Lake County sheriff department officials, the defendant never asked to speak to an attorney, nor was he harmed or threatened in any way.

Lieutenant Donald Nolan, the commander of the patrol division for the Franklin Park police department, testified that his police department is used as an overnight housing facility for the INS because of its close proximity to O'Hare Airport. Lieutenant Nolan testified, when asked to describe the accommodations within the cells in the Franklin Park police station, that each bunk has a mattress and a wool blanket. Nolan further testified that while the defendant was detained at the Franklin Park station he was fed, allowed to sleep and was checked periodically by Franklin Park officers while he was in his cell.

The defendant presented the testimony of six witnesses. Detective Farrow testified that when he took the defendant's statement in February 1989, he was aware that the Lake County sheriff's office and the Lake County State's Attorney had been in written contact with the Mexican prosecutors about the Salinas murder case. Ms. Alta Reyes, the sister of the deceased, testified that in pursuing her brother's case, she kept in contact with Agent Andrade, Sergeant Fagan and Detective Farrow and that she and Andrade eventually became personal friends.

Socorro Cuadros, the wife of the defendant, testified that she had hired attorney Ronald Menaker and paid him $250 to visit her husband on February 18, 1989. Attorney Menaker testified that, on the morning of February 18, 1989, the defendant's wife retained him to represent her husband, the defendant, who had been arrested by INS agents at 1 a.m. that morning. Menaker testified that thereafter he telephoned Lieutenant Nolan at the Franklin Park police department and advised Nolan that he did not want any officer to speak with the defendant. At about 1:30 p.m., Menaker went to the Franklin Park police station, identified himself to the desk officer, and asked to see the defendant. The desk officer told Menaker that he could not see the defendant until Detective Nolan returned to the station. At approximately 2 or 2:15 p.m., Menaker was told by the desk officer that Nolan had called in. Nolan had said he did not want anyone to see the defendant unless he was present, and that he was not sure when he would be back at the station. Menaker testified that he took this to mean that he would not be allowed to see the defendant, and he left.

The defendant also testified at the suppression hearing in his own

behalf. Defendant testified that while he was being driven from his home to Schaumburg by Agents Andrade and Turner, Andrade sat in the back seat next to him (the defendant). Defendant further testified that the INS agents did not advise him of his rights before questioning him and that on more than one occasion he had told Agent Andrade that he wanted to speak to an attorney. Defendant stated that twice during the interrogation in the car, Andrade pointed a gun at him and that he was afraid of Andrade because Andrade had said he was going to turn the defendant and his wife over to the Mexican police to be tortured and was going to take away his children and put them in a public agency. Defendant testified that at about 9 a.m. Saturday, February 18, 1989, the police allowed him to phone his wife. At that time he asked her to find him an attorney because the police were trying to charge him with the death of Salinas. Defendant testified that Agent Andrade also came to see him on Saturday afternoon. At that time Andrade again threatened the defendant and his wife.

Defendant also testified that while he was in the Franklin Park police station, he was not given breakfast on Saturday morning, February 18, 1989; that he was not given a blanket until Sunday morning, February 19; and that he was not given any meals at all on Sunday. Defendant testified that he did not sleep on Sunday night because he was awakened four or five times by Franklin Park police officers and that he was not fed on Monday, February 20, until Detective Farrow gave him food in the afternoon. Defendant testified that on Monday morning, February 20, he was again threatened by Agent Andrade. Later in the day on Monday, February 20, the defendant spoke with Detectives Farrow and Randall. Defendant testified that at that time he asked the detectives to see a lawyer and that he refused to sign the waiver of rights form because he had been denied his wish to see an attorney. Defendant stated that he was not telling the truth when he told Detective Randall that he had killed Tranquilino Salinas, but confessed to the killing because Detective Randall was frightening and intimidating him with his tone of voice and close proximity. Defendant stated that he believed that if he did not confess to Randall he and his wife would be turned over to the Mexican police and tortured. Defendant maintained that he had told Detective Randall that he wanted an attorney present at the Monday interrogation and that Randall continued to question him even after the request for an attorney was made.

At the close of the evidence, the trial court denied the defendant's motion to suppress his confession. The court found that the defendant's arrest on an immigration law violation was not pretextual, nor

was the defendant's subsequent confession involuntary. The case then proceeded to trial.

At trial, the State presented the testimony of 27 witnesses. The testimony of Agent Andrade, Detective Farrow and Detective Randall was substantially the same as their testimony at the pretrial suppression hearing. In addition, Detective Randall related the oral statement that the defendant gave to him at about 10 a.m. on February 20, 1989, at the Franklin Park police department. According to Randall, the defendant said that he and Salinas had an argument on Saturday, June 16, 1984. The defendant went to a bar and bought a handgun. Defendant then went home to the Salinas residence, where he was then living, and went to bed. The next morning, defendant put the gun in his sock and rode a bicycle along Route 12, the route Salinas took to work. He waited there until Salinas came by. Then he put the bicycle on Salinas' truck and rode in the truck to a point farther down the road. Defendant then feigned a cramp, and when Salinas pulled off the road, defendant shot him in the head. After hiding Salinas' body and cleaning up the truck, defendant abandoned the truck in the Round Lake area and rode home on the bicycle.

Randall also testified about the tape-recorded statement given by the defendant at about 7 p.m. on February 20, 1989. In the tape-recorded statement, which was admitted into evidence, the defendant related basically the same story he had given earlier to Detective Randall. At this time, however, defendant said that when he burned the clothing he used to clean up the truck, he also burned Salinas' wallet, business cards and work boots.

The State's remaining evidence can be summarized as follows. The deceased, Tranquilino Salinas, married Socorro Mendoza Salinas in 1971. In February 1984, Salinas traveled to Guadalajara, Mexico. In his absence, the defendant moved into the Salinas home. Salinas subsequently returned home, and in March 1984, the defendant began to work for him. The last time Salinas was seen alive was on Saturday, June 16, 1984. Between 7 and 8 that evening, Salinas went to dinner with some of his employees. Salinas' sister, Alta Reyes, saw the deceased at 7:15 that evening. At that time he was wearing brown Levi-type pants, a brown T-shirt, Wing brand working boots and a belt. He also carried a ring of keys on a chain attached to his belt. At the time of his disappearance, Salinas drove a red 1980 GMC pickup truck. The unlocked truck was recovered on June 20, 1984, by police in Round Lake Beach, Illinois. Local residents had reported seeing the truck there for three days. Salinas' disappearance was reported to the police at 3 p.m. on Monday, June 18, 1984, by his wife.

After Salinas disappeared, the defendant continued to reside in the Salinas residence.

Adalberto Valencia had worked for Salinas. Valencia testified that three days before Salinas disappeared, the defendant told him that Salinas' red pickup truck belonged to him (the defendant) and that the defendant offered to sell Salinas' red pickup truck to Valencia for $1,000. Valencia testified that he also saw a pistol in the glove compartment of the truck. Valencia further testified that on June 16, while Salinas, the defendant and Valencia were together in Salinas' truck, he overheard the defendant say that he was not going to work the next day and that he was going to take Salinas' wife to a lake. Valencia testified that Salinas was supposed to pick him up at 6:30 a.m. on June 17, 1984, but that Salinas never arrived. At 7 a.m., Valencia telephoned Salinas' home and was told by Salinas' daughter that he was not there. Valencia phoned again at 7:30 a.m., and Salinas was still not home. At about 7 p.m., Socorro Mendoza Salinas telephoned Valencia to ask about her husband. Valencia also testified that one month after Salinas' truck was recovered, he heard the defendant say that the truck was now in the defendant's name and that the defendant showed Salinas' driver's license to him.

John Marlowe testified that in 1984 he lived at 164 Ada Street in Williams Park, Wauconda Township. He stated that a few days after Salinas disappeared in June 1984, Socorro Salinas and the defendant began to meet at the house next door to his. Marlowe stated that on several occasions he observed Socorro and the defendant making love. Salinas' body was discovered on March 19, 1985, on the property of Paul Van Anrooy at Cuba Road in Crestview in Long Grove, Illinois. Items of clothing were found with the remains, including pants, a belt, work boots and socks. A business card holder containing Salinas' business cards was found in the pocket of the pants. A key chain containing keys was partly attached to the deceased's belt.

Dr. Larry William Blum, the pathologist who conducted the autopsy on Salinas' body, testified that, in his opinion, a gunshot wound to the head caused the death of the victim. Dr. Carl Hagstrom, an expert in the field of forensic odontology, testified that the victim was identified as Tranquilino Salinas. Salinas' sister, Alta Reyes, identified the boots, pants, belt and key ring found with the body as items belonging to her brother. She also identified a business card of T & S Landscaping as belonging to her brother.

The defendant presented the testimony of 14 witnesses. The testimony of attorney Ronald Menaker and the defendant was substantially the same as their testimony at the suppression hearing. The re-

mainder of the defendant's evidence can be summarized as follows.

Four individuals testified about seeing Salinas' red pickup truck, which was abandoned near their homes in Round Lake Beach. Yvonda Henderson testified that she first noticed the truck between 11:30 p.m. on June 16 and 1 a.m. on June 17, 1984. Pamela Williams saw the pickup truck at about 1 a.m. on June 17. Earl Williams noticed the truck at about 5:30 or 6 a.m. on June 17. Steve Kreski saw the truck between 7 and 8 a.m.

Detective Farrow testified regarding an interview he conducted with Adalberto Valencia at the time of Salinas' disappearance. When Farrow asked if he knew anything about a gun, Valencia stated that he did not. Nor did Valencia tell Farrow anything about the defendant trying to sell him Salinas' truck, about seeing Salinas' driver's license, or about seeing the defendant with a gun.

Officer Steven Semenek of the Lake County sheriff's department testified that on March 20, 1989, he found a .12 gauge shotgun shell about 20 feet from where the remains of Salinas were found. Private investigator Edward Carmody testified that the distance from the Salinas residence to the place where Salinas' body was found was 11.4 miles and that the distance between Salinas' home and the location where Salinas' pickup truck was found was 12.3 miles.

Noelia Salinas is the daughter of Tranquilino Salinas. Noelia testified that she saw the defendant at the Salinas home after 6 p.m. on Saturday evening, June 16, 1984. On Sunday morning, June 17, 1984, at 7 a.m., Noelia woke up and went downstairs with her brother. The defendant was in the basement sleeping at that time. Noelia and her brother awakened the defendant, and they went to the den to watch television. The three then got dressed and went to a restaurant in Wauconda for breakfast. Noelia testified that she did not see her father at home on Saturday night, June 16, or Sunday morning, June 17, 1984.

The jury in the case subsequently found the defendant guilty of murder. The defendant's motion for a new trial was denied, and the court sentenced the defendant to a term of 34 years in prison.

On appeal, defendant first contends that the trial court erred in denying the motion to suppress, on the ground that his arrest on the immigration charge was merely a pretext to take him into custody for questioning about the Salinas homicide. Specifically, the defendant argues that the following "facts" indicate the pretextual nature of the arrest: (1) Agent Andrade's motive in arresting defendant; (2) Andrade's relationship with Alta Reyes; (3) Andrade's reason for being in Chicago; (4) Andrade's choice of detention facility; (5) Andrade's

cooperation with Deputy Farrow; and (6) Andrade's involvement in the Lake County investigation. The evidence presented at defendant's suppression hearing and at trial does not support his contention.

■ It is well settled that an arrest may not be used as a mere pretext to avoid the warrant requirement of the fourth amendment. (*People v. Hattery* (1989), 183 Ill. App. 3d 785, 813.) However, the issue of pretext is not implicated where an officer otherwise has probable cause to arrest a person. (*People v. Fenner* (1989), 191 Ill. App. 3d 801, 807.) Rather, the proper approach for evaluating compliance with the fourth amendment is to assess objectively the officer's actions in light of the facts and circumstances before him at the time without regard to his underlying intent or motivation. *Fenner*, 191 Ill. App. 3d at 807, citing *People v. Hoskins* (1984), 101 Ill. 2d 209, 213-14.

The case law is replete with examples where courts have upheld the admission of evidence where law enforcement officers acted in the ordinary course of investigation and for a proper purpose, despite defendants' claims of pretextual arrests. In *Abel v. United States* (1960), 362 U.S. 217, 4 L. Ed. 2d 668, 80 S. Ct. 683, the Federal Bureau of Investigation (FBI) suspected the defendant was a Russian spy, but did not have sufficient evidence to arrest him, so it notified the Immigration and Naturalization Service (INS) that defendant might be an illegal alien. Acting pursuant to an administrative warrant, INS officials arrested defendant to determine whether he was residing illegally in the United States. Following the arrest, the FBI searched his room; evidence of espionage was obtained, and defendant was charged with conspiracy to commit espionage. Defendant sought to suppress the evidence on ground that the administrative warrant was a pretense and that the government's true purpose in arresting him was not to determine his deportability but to discover evidence of his espionage. In response, the Supreme Court stated:

> "Were this claim justified by the record, it would indeed reveal a serious misconduct by law-enforcing officers. The deliberate use by the Government of an administrative warrant for the purpose of gathering evidence in a criminal case must meet stern resistance by the courts. The preliminary stages of a criminal prosecution must be pursued in strict obedience to the safeguards and restrictions of the Constitution and laws of the United States. A finding of bad faith is, however, not open to us on this record." *Abel*, 362 U.S. at 226, 4 L. Ed. 2d at 678, 80 S. Ct. at 690.

In *People v. Evans* (1988), 125 Ill. 2d 50, the Illinois Supreme Court reviewed a case involving a defendant convicted of murder. The

defendant in that case was arrested by police at his home after a woman filed a complaint against him for a totally unrelated assault. Police placed defendant Evans under arrest for this assault and for another felony unrelated to the murder and took him to the police station, where he later confessed to the homicide. Our supreme court found that there was no pretextual arrest where the police went to the defendant's home with a fresh complaint for assault, even though he was arrested by a violent crimes detective investigating the homicide and then questioned about four crimes, including the homicide. The court further stated that merely because the defendant was in custody for one charge does not preclude the police from investigating other unrelated charges concerning the defendant. *Evans*, 125 Ill. 2d at 72.

In *People v. Anderson* (1988), 169 Ill. App. 3d 289, the Illinois Appellate Court, Third District, considered the case of a defendant initially suspected of murder and known by police to have a prior record for violent crimes and a suspended driver's license. When defendant in that case entered his car, police detectives followed behind. When he exited, they asked for his license, which he admitted was suspended. Defendant was immediately arrested on the suspended license charge and taken to the police station for questioning, although neither detective had a ticket book with him and he was not issued a citation upon his arrival. Defendant cooperated with the police during the next several hours and eventually confessed to the murder. The trial court in *Anderson* found that the officers, deviating from their normal, customary procedures, had arrested Anderson under a pretext to place him in a disadvantageous position where he could be questioned about the murder and granted his motions to suppress his confession. On appeal, the court announced that it would evaluate alleged fourth amendment violations under a standard of objective reasonableness without regard to the officers' underlying motivations. Because the officers had acted with legal authority in arresting Anderson on the suspected license charge, the appellate court found that the trial court had erred in granting the motions to suppress. *Anderson*, 169 Ill. App. 3d at 299-300.

In *People v. Hattery* (1989), 183 Ill. App. 3d 785, Chicago police, while investigating three homicides in which the defendant was the prime suspect, interviewed two persons who, in the course of investigatory procedures, gave police information relating to the defendant's involvement in an unrelated crime. Although convinced that probable cause existed to arrest defendant for those homicides, police were denied the State's Attorney's approval for murder warrants on three oc-

casions. Police subsequently discovered the initial incident report of the unrelated crime, which corroborated the statements of the persons interviewed. Police then located the alleged victim of the unrelated aggravated battery who signed a complaint against defendant and procured a valid arrest warrant from a judge. Police detectives gave the battery warrant to a special agent of the State police who subsequently arrested defendant. While in police custody, defendant later confessed to the three murders. The Illinois Appellate Court, First District, found that, in light of the circumstances, the law enforcement officers' actions were objectively reasonable and that the officers would have been derelict in their duty had they not arrested the defendant with the valid felony warrant in their possession. The court then found that defendant's confession was not the product of an unreasonable seizure based on a pretextual arrest. *Hattery*, 183 Ill. App. 3d at 819.

The issue then before this court is whether the trial court erred in denying the defendant's motion to suppress his statements on pretextual arrest grounds. The trial court's ruling on a motion to suppress should not be overturned unless it was manifestly erroneous. *People v. Murray* (1990), 137 Ill. 2d 382, 387; *People v. Neal* (1985), 109 Ill. 2d 216, 218.

The trial court found that Agent Andrade had sufficient evidence of defendant's illegal status to rise to the level of probable cause. Probable cause exists when the totality of the facts and circumstances known to the police would justify the belief, in a person of reasonable caution, that the person arrested has committed an offense. (*People v. Hattery* (1989), 183 Ill. App. 3d 785, 819.) The standard for determining whether probable cause is present is the probability of criminal activity, rather than proof beyond a reasonable doubt. (*Hattery*, 183 Ill. App. 3d at 819.) In the present case, the evidence shows that Agent Andrade had received information that the defendant was in this country illegally. In February 1986, Detective Gil Farrow of the Lake County sheriff's office informed Andrade that the defendant was in this country illegally. The defendant, however, subsequently returned to Mexico. In February 1989, Andrade received information from Alta Reyes, the deceased's sister, that the defendant was again present in Illinois. Andrade then had an INS clerk run a computer check on defendant's file, and nothing in the INS computer indicated that the defendant was in this country legally. Andrade then applied for and obtained the administrative warrant for defendant's arrest. A reviewing court will not disturb a trial court's determination of probable cause unless it is manifestly erroneous. (*Hattery*, 183 Ill.

App. 3d at 820.) Based on our review of the evidence, we agree with the trial court that there was probable cause to arrest the defendant on the immigration law violation.

■ Although it was not necessary to do so, in light of this court's holding in *People v. Fenner* (1989), 191 Ill. App. 3d 801, 807 (issue of pretext is not implicated where an officer otherwise has probable cause to arrest), the trial court also held that the defendant's arrest on the immigration charge was not pretextual. In reaching this conclusion the court found that Agent Andrade acted in good faith in obtaining the warrant for initiating deportation proceedings, and that the Lake County sheriff's department had not taken part in the issuance of the 1989 administrative warrant. The evidence shows that, contrary to defendant's misleading assertion to the contrary, the "sole purpose" in detaining the defendant was not to arrange for his interrogation concerning the Salinas homicide. This is demonstrated by Agent Andrade's testimony on cross-examination and redirect examination:

"Q. Okay. At that time did you discuss with [the assistant district director for investigations] the fact that the defendant was sought for questioning regarding a murder?

A. Yes sir; I did. That was the reason for the warrant.

Q. That was the reason for the warrant?

A. Well, let me put it to you this way, sir. Anytime that an illegal alien is on the streets when he is convicted or suspected or whatever, he may not have any proceedings against him as long as he's here illegally. We try to get him off the street and deported from the country.

\* \* \*

Q. You stated on cross examination yesterday that in response to a question by counsel that the fact that Mr. Mendoza was a suspect in a murder was in fact a reason for you obtaining the warrant for his arrest; is that correct?

A. Not the sole reason, no, sir.

Q. Could you explain exactly what you mean by that, or meant by that? \*\*\*

THE WITNESS: Yes, sir. We had plenty of reason to believe that Mr. Cuadros Mendoza was in the country illegally. We determined that by his own admission that he was in the country illegally. Anytime that an alien is believed to be dangerous, it's our duty to go out there and get this person and make a determination as to his status and get him out of the country."

Under the facts and circumstances of this case, and in light of the rel-

evant case law discussed above, we conclude that the trial court's finding, that the defendant's confession was not the product of an unlawful pretextual arrest, was not manifestly erroneous. Since we find that defendant's arrest and detention were not unlawful, we need not consider defendant's additional argument that the State failed to prove that his inculpatory statements were an exercise of his free will, independent of any taint of an illegal arrest.

Defendant's next contention also relates to a claim of trial court error in denying his motion to suppress. Defendant maintains that, even if his arrest was lawful and not pretextual, the subsequent confession was involuntary and should have been suppressed. Defendant urges several reasons in support of his claim.

■■ ■ The applicable test for voluntariness is whether the statement was made freely and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he confessed. (*People v. Dodds* (1989), 190 Ill. App. 3d 1083, 1090; *People v. Hattery* (1989), 183 Ill. App. 3d 785, 821.) In making its decision, the trial court need not be convinced beyond a reasonable doubt, but the State has the burden of showing by a preponderance of the evidence that a statement was made without compulsion of any sort. (*Hattery*, 183 Ill. App. 3d at 821.) The finding of the trial court that a statement was voluntary will not be disturbed on review unless it is contrary to the manifest weight of the evidence. *Hattery*, 183 Ill. App. 3d at 821.

First, defendant maintains that his confession was involuntary and should have been suppressed because he was denied access to his attorney. The trial court found that, pursuant to *Moran v. Burbine* (1986), 475 U.S. 412, 89 L. Ed. 2d 410, 106 S. Ct. 1135, and *People v. Holland* (1987), 121 Ill. 2d 136, the defendant was not denied his right to counsel. We agree with the trial court.

■■ In *Burbine*, a suspect confessed after receiving and waiving his *Miranda* rights. He did so without knowledge that his sister had retained an attorney to represent him and that an associate of the attorney had been in telephone contact with the police. While the associate was told that Burbine would not be questioned until the following day, police in fact interrogated him later that evening, securing three written statements from the defendant. The United States Supreme Court concluded that a suspect's knowing and intelligent waiver of his *Miranda* rights does not require knowledge that an attorney has been retained or information that the attorney has been in contact with the police or has attempted to see the suspect. The court held:

"Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." *Burbine* (1986), 475 U.S. at 422-23, 89 L. Ed. 2d at 422, 106 S. Ct. at 1141.

In *Holland*, the defendant also confessed after receiving and waiving his *Miranda* rights. In that case, the defendant had asked his wife to retain a specific attorney. The defendant's wife did in fact retain the attorney, who was unsuccessful in his efforts to see the defendant. Following *Burbine*, our supreme court held that the defendant was given his *Miranda* rights, that he understood the nature of those rights, and that his *Miranda* waiver was valid despite the fact that he was not told that an attorney wanted to confer with him. *Holland*, 121 Ill. 2d at 153.

■ We agree with the trial court that *Burbine* and *Holland* govern the disposition of this issue and find that the defendant was not denied his right to counsel. Here, as in *Burbine* and *Holland*, a relative secured counsel for the defendant, and the defendant was never aware that counsel had actually been retained. Moreover, the trial court in this case found that the defendant never mentioned to anyone that he was in the process of obtaining an attorney through his wife or in any other fashion.

*People v. Fleming* (1985), 134 Ill. App. 3d 562, cited by defendant, is distinguishable. In that case, Chicago police investigating a shooting traveled to Georgia, where the defendant had been arrested for the Chicago shooting. The defendant refused to answer questions, telling police that he wanted to talk to an attorney first. Ignoring the request, the officers returned the defendant to Chicago and began to question him again, even though they knew that the defendant's mother had retained an attorney for him. Though this was held to be a clear violation of *Miranda*, the court in *Fleming* noted that the defendant's request for an attorney was clear and unambiguous. (*Fleming*, 134 Ill. App. 3d at 570.) Such is not the case here, where the trial court found that the defendant never asserted his right to an attorney to any law enforcement officers.

We feel similarly unconstrained by *People v. Smith* (1982), 93 Ill. 2d 179. In *Smith*, the Illinois Supreme Court held that there could be no knowing waiver of the right to counsel where the defendant's attorney was present and seeking to consult with him. (*Smith*, 93 Ill. 2d at 189.) However, it is important to note that in *Smith* the defendant

had actually met with an attorney after his arrest and personally retained him as counsel. Here, although attorney Menaker was present at the Franklin Park station, the key fact remains that defendant did not personally retain Menaker, nor did he have actual knowledge that counsel had been retained.

 Defendant also argues that we should attach significance to the defendant's failure to sign the written waiver of rights form. However, the failure to make a written statement does not by itself determine the propriety of a defendant's confession. (*People v. Jennings* (1986), 142 Ill. App. 3d 1014, 1031.) Here, although defendant testified at his suppression hearing and at trial that he was not advised of his *Miranda* rights at the time of his arrest or prior to subsequent interrogation, the State presented testimony to the contrary. The trial court also found that defendant was advised of his rights and voluntarily waived them. A trial court's determination that a confession is voluntary will not be reversed unless it is contrary to the manifest weight of the evidence. (*Hattery*, 183 Ill. App. 3d at 821.) At a hearing on a motion to suppress, it is the function of the trial court to determine the credibility of the witnesses and to determine the weight to be given to their testimony. (*People v. Morgan* (1986), 112 Ill. 2d 111, 136; *People v. Dodds* (1989), 190 Ill. App. 3d 1083, 1094.) The fact that the defendant decided not to sign a waiver form does not cast sufficient doubt on the State's evidence that he had earlier stated that he understood his rights and voluntarily waived them. (*People v. Torres* (1990), 200 Ill. App. 3d 253, 265.) Based on the evidence, we cannot conclude that the trial court's finding was against the manifest weight of the evidence.

 Next, defendant argues that his confession was involuntary because he was threatened and physically abused by Agent Andrade and Lake County sheriff's deputies, and because he was deprived of sleep, warmth, and food while he was detained at the Franklin Park police department. As to the allegations of threats and physical abuse, Agents Andrade and Turner both testified that no threats were made to or concerning the defendant or his wife. As the trial court found, defendant's claims of threats and physical abuse were not corroborated and were in fact controverted by the State's witnesses. The court stated that there was "no credible evidence to establish that the defendant sustained any physical injuries, or any credible evidence that he received any threats of physical injury on February 18, 19 or 20 of 1989 as a result of any investigation by Special Agent Andrade or any other state, local or federal officer." The court further found that the duration of the interrogation and the manner in which it was

conducted were not coercive. As we noted previously, it is the function of the trial court to determine the credibility of the witnesses. (*Dodds,* 190 Ill. App. 3d at 1096.) In this regard, we decline to substitute our judgment for that of the trier of fact. *People v. Visnack* (1985), 135 Ill. App. 3d 113, 120.

■■■ As to the deprivation of sleep, warmth and food, defendant argues that his testimony on these points was not rebutted by the State. Defendant maintains that such uncontroverted testimony must not be disregarded by the trial court. (*People v. Rhoads* (1979), 73 Ill. App. 3d 288.) Contrary to defendant's assertion, however, his testimony was not completely uncontroverted. Lieutenant Donald Nolan of the Franklin Park police department testified to the effect that the defendant was fed regularly and that each bunk in the Franklin Park police department contained a wool blanket. Nolan also testified to the effect that the defendant was checked periodically while he was in his cell. On cross-examination during the suppression hearing, the defendant stated that the police officers who allegedly woke him up were the same officers that checked on him hourly. The trial court, after hearing testimony, found that "no action[s] by Andrade, the Franklin Park police department, or any other agencies were designed or intended to coerce the confession" and that "the conditions in the jail or the like didn't have anything to do with his giving the confession." The State's evidence, if believed, was sufficient to support the trial court's finding. *Dodds,* 190 Ill. App. 3d at 1097.

■■■ ■ Defendant also contends that his inculpatory statements were involuntary because, during the 57 hours that he was in custody prior to making the statements, he was never brought before a judicial officer. Delay in presenting a defendant to a judge for a probable cause hearing is but one factor to be considered in determining the voluntariness of a statement obtained during the delay. (*Dodds,* 190 Ill. App. 3d at 1090.) In Illinois, the case law suggests that if the circumstances of a confession suggest it was voluntary, and not in violation of a defendant's rights, it will not be suppressed, even if made after a lengthy period of detention before presentment before a judge. (See *Dodds,* 190 Ill. App. 3d at 1091; *People v. Nicholls* (1969), 42 Ill. 2d 91; *People v. Taylor* (1968), 40 Ill. 2d 569.) The defendant was arrested on a Saturday at about 1 a.m. The trial court took judicial notice that the following Monday was a Federal holiday. We agree with the State that there is nothing inherently coercive in the fact that, under these circumstances, the defendant had not been brought before an immigration judge

prior to his questioning on Monday, February 20, 1989.

Defendant next argues that an English-Spanish language barrier affected the voluntariness of his statements. We disagree. The defendant himself testified that he understood the English language. The State presented testimony to the effect that the defendant was informed of his constitutional rights in both English and Spanish. The trial court found that the defendant was presented with written *Miranda* warnings both in English and in Spanish and that the defendant had an ability to understand both English and Spanish. Although the defendant concedes that the trial court found as a matter of fact that he was advised of his constitutional rights, defendant fails to note that the trial court also found that "the credible evidence is that the defendant understood these warnings, and that there was a knowing, intelligent, and voluntary waiver of these rights." We see no reason to disagree with the trial court in this regard. The voluntariness of defendant's statements was not affected by a language barrier.

In summary, an examination of the trial court's comments and findings reveals that the trial court took care to consider all the facts urged by defendant and found that his confession was voluntarily given. In reviewing the denial of defendant's motion to suppress, we are conscious of our responsibility to show deference to the findings of a trial court that has assessed credibility, demeanor and the relevant facts. (*People v. Bernasco* (1990), 138 Ill. 2d 349, 364.) The court's conclusions are supported by the record, and we find no error in them.

Defendant's final contention is that the State failed to prove him guilty beyond a reasonable doubt. Defendant argues that the State presented no evidence corroborating his confessions to the crime and that the confessions conflicted with important details of the homicide.

Generally, an uncorroborated confession is insufficient to support a conviction. (*People v. Dodds* (1989), 190 Ill. App. 3d 1083, 1096.) In Illinois, the corroboration necessary to sustain a conviction based on a confession is provided by proof of the *corpus delicti*, which in a murder case consists of the fact of the death and that the death was caused by the criminal agency of another. *Dodds*, 190 Ill. App. 3d at 1096.

In this case, the fatal shooting was clearly caused by the criminal agency of another, and the evidence presented at trial sufficiently validated the statements in defendant's confession. The State presented the testimony of forensic pathologist Larry Blum,

who performed an autopsy on the remains of a male subject. It was Dr. Blum's expert opinion that the cause of the subject's death was a gunshot wound to the head. Blum further testified that the wound was consistent with the gun being fired from the victim's right side. Carl Hagstrom, an expert in the field of forensic odontology, identified the shooting victim as Tranquilino Salinas. The identification was accomplished by matching Salinas' dental records with the teeth remaining in and found near the skull. The defendant's statement to Detective Randall that he shot Salinas in the head, from the passenger side of Salinas' truck, was consistent with Dr. Blum's testimony concerning the manner and cause of Salinas' death, that is, a gunshot wound to the right side of the head. As applied in Illinois, the *corpus delicti* rule requires only that the evidence apart from the defendant's confession tend to show that a crime was committed; the independent evidence need not establish the crime beyond a reasonable doubt. (*People v. Furby* (1990), 138 Ill. 2d 434, 450; *Dodds*, 190 Ill. App. 3d at 1096.) The State has met its burden in this regard.

We also disagree with defendant's contention that, due to inconsistencies between his inculpatory statements and the evidence presented at trial, he was not proved guilty beyond a reasonable doubt. Defendant maintains that his confessions contradict the evidence as to precisely when and how the homicide took place. Defendant specifically points to evidence that the truck had been abandoned earlier than indicated by his confession; evidence that Salinas' boots and cards were found with his remains, not burned as per his confession; and evidence that a gun was seen in defendant's car prior to the time defendant said he bought a gun.

We note at the outset that there is no requirement that the independent evidence and the details of a confession correspond in every particular. (*Furby*, 138 Ill. 2d at 451.) Where the evidence is conflicting, this court will not substitute its judgment for that of the trier of fact. (*People v. Sambo* (1990), 197 Ill. App. 3d 574, 581.) A conflict in the evidence does not establish a reasonable doubt, and a jury verdict based on substantial and credible evidence is not rendered reversible by the fact that other evidence was introduced which might, if believed, have resulted in a different verdict. Only where the record leaves the reviewing court with a grave and substantial doubt of guilt should the conviction be reversed. (*Sambo*, 197 Ill. App. 3d at 581.) In the present case, the circumstances related in the confession and the corroborating evidence were sufficient to prove defendant guilty beyond a reasonable doubt. The jury

chose to believe the State's evidence, and we do not find that the corroboration of the confession was so improbable as to raise a reasonable doubt of defendant's guilt.

For these reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

DUNN and UNVERZAGT, JJ., concur.